## CITY OF VINCENNES, IND., v. MARLAND REFINING CO.

Circuit Court of Appeals, Seventh Circuit. May 17, 1929.

No. 4057.

Arnold J. Padgett, of Vincennes, Ind., for City of Vincennes.

Fredrick E. Matson, of Indianapolis, Ind., for Marland Refining Co.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

PAGE, Circuit Judge. The District Court perpetually enjoined the city of Vincennes, Ind., called city, from enforcing its Ordinance No. 461, as against appellee. The ordinance, adopted May 13, 1927, after appellee had on March 11, 1927, filed for record its deed of property purchased for the sole purpose of erecting a gasoline filling station, reads:

"An ordinance regulating the erection, location and maintenance of drive-in retail and wholesale gasoline and oil filling stations within the city of Vincennes and prescribing a penalty for violation thereof.

"Sec. 1. *Be it ordained by the common council of the city of Vincennes, Indiana,* that it shall be unlawful for any person, firm or corporation, either as owner, lessee, lessee manager, officer or agent to erect or maintain any drive-in retail or wholesale gasoline or oil filling station at any point within the corporate limits of the city of Vincennes, Indiana, without first obtaining the written consent of majority of the property owners owning property, whether a resident or non-

resident, located within a radius of three hundred (300) feet of the place where said retail or wholesale gasoline or oil filling station is supposed to be located, erected or maintained thereon; the measurement of said three hundred (300) feet shall begin at the line of the property on which said retail or wholesale gasoline or oil filling station is to be located, erected, or maintained; provided, however, that in no event shall any station or stations be erected or maintained within two hundred (200) feet of any church or place of worship or of any school, either public, private or parochial; provided, however, that the definition for drive-in retail or wholesale gasoline or oil filling station as prescribed in this ordinance shall be 'a building or station in which gasoline or oil is sold at retail or wholesale with the pumps on the inside or outside of said building.'

"Sec. 2. Any person, firm or corporation violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and on conviction shall be fined in any sum of not less than $100 or more than $500 for each offense, and each day's violation of the provisions of this ordinance shall constitute a separate offense.

"Sec. 3. Whereas an emergency exists for the immediate passage of this ordinance the same shall be in full force and effect from and after its passage, as provided by law."

Appellee obtained the property consents required by the ordinance, and made application for a permit to build, but it was refused for the sole reason that the station would, because within 200 feet of a church and a school, violate the ordinance.

This plat shows the relation of the three streets and of the properties in the legend to each other:

(1) Church and school (whole block).
(2) Indian Refining Co. drive-in station.
(3) Plaintiff's property.

Main Street, the city's principal business thoroughfare, is 50 feet wide, and is here treated as running east and west.

The undisputed facts show that four filling stations that violate the ordinance were maintained from a time prior to the ordinance up to the date of the decree herein. Three more filling stations having curb pumps were so maintained within 200 feet of a church or school building. Numerous other filling stations, either drive-in or curb, were at the time of the adoption of the ordinance and the entry of the decree to be found in the business district of the city. A drive-in station, for which a permit was applied on March 19, 1928, was built and was maintained up to the time of the decree. In October, 1927, five months after the passage of the ordinance, a curb filling station in connection with a garage, with only the width of the street between the pumps and the Francis Vigo public school property, was built under permit and maintained to the time of the decree. No consents from property owners were required as to this station."

█ The city claims that it acted under the power given by clause 15, section 53, of the Cities Act of 1905, being section 10284 Burns' Indiana Statutes 1926, which reads:

"The common council of every city shall have power to enact ordinances for the following purposes: * * *

"Fifteenth. To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal oil, benzine, turpentine, hemp, hay, straw, cotten, nitroglycerin, dynamite, giant powder, petroleum, gasoline, gas or any product thereof, or any other explosive or combustible material or other material which may be deemed dangerous."

The power given is to regulate or prevent storage of the enumerated articles, evidently because of the danger to persons and property from fires and explosions.

It is claimed that the ordinance is a valid exercise of the power to regulate the storage of gasoline—the only item of clause 15 in any way here involved.

The title to the ordinance does not mention storage, but the stated purpose is to regulate "the erection, location and maintenance of drive-in retail and wholesale gasoline and oil filling stations."

The record shows two kinds of filling stations: (a) Curb stations, where the vehicle stops in the street at the curb and is there filled; (b) drive-in stations, where the vehicle leaves the street and is filled on private property. Although it is a matter of common knowledge that pumps are now very generally used at both kinds of stations, yet their presence or absence does not affect the above definitions. The ordinance provides its own definition of the station covered by it, the substance of which is that it is a building

in which gasoline or oil is sold, having pumps on the inside or outside. The sole regulatory provision in the ordinance is that the building defined shall not be erected or maintained within 200 feet of any place of worship or school. There is no regulation as to the kind of building to be erected or instrumentality used for the storage of gasoline, or of the methods of handling by which the gasoline is taken in or put out, nor of the quantity of gasoline to be stored, nor of anything that would tend to prevent fires or explosions.

We are of opinion that the ordinance is not one to regulate the storage of gasoline. There is no conceivable careless, dangerous, or even criminal thing that may be done in handling or storing gasoline, either as to place or conditions, that may not be indulged in with impunity so far as this ordinance is concerned. It does not tend to accomplish any purpose for which the power was given in clause 15. In the city's answer to the bill it says, in part:

"That it had learned from experience that gasoline filling stations, such as proposed by the plaintiff, were becoming so numerous in said city, two of which are owned and operated by plaintiff, as to render the use of the streets and sidewalks hazardous, and that the time had come to place some restraint upon the location of such enterprises, and that it enacted said ordinance and refused the permit to the plaintiff to erect its said station solely as a means of safe-guarding, as far as possible, the health, lives and limbs of its citizens."

Another reason stated in the answer is:

"For the purpose of preserving and maintaining in a reasonably safe condition its public streets and sidewalks, and for the purpose of protecting the public in traveling along and upon its sidewalks."

The city attorney testified:

"The reason this ordinance was passed was the building of this station at Eighth and Main" (appellee's).

"The city is dotted all over with filling stations, they are on nearly every corner. The ordinance was passed as a measure to curtail the erecting of filling stations."

From this evidence and the answer, it appears that the ordinance was not passed to regulate the storage of gasoline, and that the question of danger from fire or explosion from the storage of gasoline did not enter into the considerations that induced the passage of the ordinance.

Although it is admitted that the ordinance does not apply to any curb station, or to any drive-in station unless it is within 200 feet of a house of worship or school, yet the city contends that there is no discrimination as between the drive-in and the curb station because there is a reasonable basis of classification, namely, "that a drive-in filling station necessarily calls for the use of portions of the sidewalks by motor vehicles, such as automobiles, busses and trucks, while a curb filling station does not call for such use of the sidewalks." It was in this connection that the city, in argument, stressed its proposition that the lives and limbs of the many children attending the school, across Main street from plaintiff's property, would be endangered by automobiles crossing the sidewalks while going to and from appellee's filling station.

For many reasons, the thing urged is no basis for a classification. Neither sidewalk crossings nor dangers arising from vehicles crossing the same is mentioned in the ordinance. The evidence indicates that the danger from either of those sources was never considered. The mayor said that there was no objection to the station if the people down there wanted it and the priest consented. A majority of the people within 300 feet indicated their desire by signing the consent required by the ordinance, and the priest said if he could not have a park or a residence he did not object to the station. Seven of the eight trustees of the school did not object.

From May 13, 1927, when the ordinance was adopted, to April 28, 1928, when the decree was entered, no attempt was made to enforce the ordinance and prevent those alleged dangers, even as to the drive-in station shown on the plat above to be situated with reference to the church and school property, as to location and distance, the same as appellee's. No child going to or from the house of worship or school would pass over the sidewalk crossed by vehicles going to and from appellee's property, excepting only those, if any, passing along the west side of Ninth street, north of Main.

In State of Washington v. Roberge, 278 U. S. 116, 121, 49 S. Ct. 50, 52 (73 L. Ed. —), the court said:

"Legislatures may not, under the guise of the police power, impose restrictions that are unnecessary and unreasonable upon the use of private property or the pursuit of useful activities." See Louisville Gas Co. v. Coleman, 277 U. S. 32, 37, 48 S. Ct. 423, 72 L. Ed. 770.

If by any stretch of the imagination the ordinance may be considered as one regulating the use of sidewalk crossings in aid of the regulation of gasoline storage, it is un-

reasonable and oppressive. Every law is a limitation and burden upon the rights of the people. Common sense and justice, as well as the Constitution of the United States, require that, so far as may be, the limitations and burdens shall be equal as to all those similarly situated. Louisville Gas Co. v. Coleman, 277 U. S. 32, 37, 48 S. Ct. 423, 72 L. Ed. 770. The limitation under the ordinance, as claimed in argument, is a limitation upon the right to cross sidewalks with vehicles, and, if there was to be any classification it should have included all those who were, or who desired to be, users thereof by crossing with vehicles.

This ordinance applies only to those who have or who desire to have drive-in stations located within 200 feet of a house of worship or a school. It has been enforced against appellee only. So far as anything in the ordinance affects the question, appellee or any one else having an oil station 201 feet or more from a house of worship or a school could use, without limit, any sidewalk crossing, even though such crossing was within 10 feet or less of the main entrance or exit of any house of worship or school. Every other concern or individual might, unaffected by the provisions of the ordinance, use any sort of a vehicle to cross or recross sidewalks in transportation for the storage or removal of gasoline, benzine, dynamite, and every other article enumerated in clause 15, without regard to the distance of such crossing from houses of worship or schools, and when those articles were transported across the sidewalk they might be stored in any manner, in any quantity, within any distance, of such houses of worship or schools. It would be difficult to conceive of an ordinance less calculated to regulate the storage of gasoline, or to regulate or prevent anything else, except to prevent appellee from building its filling station.

The ordinance is invalid because it denies to appellee equal protection under the law, and its attempted administration against appellee only is vicious and unlawful.

The decree is affirmed.

EVAN A. EVANS, Circuit Judge (dissenting). The ordinance under consideration (set forth in the majority opinion) was in my opinion a valid exercise of police power by appellant.

This conclusion is predicated on the assumption that the modern municipality is not a medieval city, possessing only those powers *expressly* conferred upon it by a franchise. Rather is it a public institution for self-government and for the local administration of the affairs of state. It is a part of the civil government of the state. Its purpose and object is to supply the wants and regulate the conduct of congested populations through ordinances of their own making and by officers of their own choice. The extent and operation of its functions and powers must be determined by the purpose and object of its creation and existence.

For convenience sake these powers may be classified as express, implied, or inherent. Dillon's Municipal Corporations, § 319; City of Crawfordsville v. Braden, 130 Ind. 149, 28 N. E. 849, 14 L. R. A. 268, 30 Am. St. Rep. 214.

In the latter case the court said:

"Among the implied powers possessed by municipal corporations in this State [Indiana] are those grouped under the somewhat comprehensive title of "Police Powers"—a power which it is difficult either to precisely define or limit; a power which authorizes the municipality in certain cases to place restrictions upon the power of the individual both in respect to his personal conduct and his property; and also furnishes the only authority for doing many things not restrictive in their character, the tendency of which is to promote the comfort, health, convenience, good order and general welfare of the inhabitants.

"The police power primarily inheres in the State; but the Legislature may, and in common practice does, delegate a large measure of it to municipal corporations. The power thus delegated may be conferred in express terms, or it may be inferred from the mere fact of the creation of the corporation. The so-called inferred or inherent police powers of such corporations are as much delegated powers as are those conferred in express terms, the inference of their delegation growing out of the fact of the creation of the corporation, and the additional fact that the corporation can only fully accomplish the objects of its creation by exercising such powers.

"Special charters, as well as general statutes for the incorporation of cities and towns, usually contain a specific enumeration of powers granted to and which may be exercised by such corporations. In many cases the powers thus enumerated are such as would be implied by the mere fact of the incorporation."

From an examination of the statutes of many states, it is apparent that Legislatures, after enumerating and delegating all the pow-

ers that suggest themselves in the light of past experience, usually recognize the possibility of omissions and add a clause granting to the municipality power to do all such acts and pass such ordinances as may conduce to the public welfare. Dillon's Municipal Corporations, §§ 316, 316. This was done by the state of Indiana. Burns' Annotated Indiana Statutes, 10284.

"The common council of every city shall have power to enact ordinances for the following purposes: * * * To carry out the objects of the corporation, not hereinbefore particularly specified."

It is likewise quite generally held that powers conferred on municipal corporations in general terms should be construed to be *in addition* to the powers specifically enumerated. In Southern Utilities Co. v. Palatka, 86 Fla. 583, 99 So. 242, the court said:

"General powers given to a municipality should be interpreted and construed with reference to the purposes of the corporation. Where particular powers are expressly conferred and there is also a general grant of power, such general grant by intendment includes all powers that are fairly within the terms of the grant and are essential to the purposes of the municipality, and not in conflict with the particular powers expressly conferred. The law does not expressly grant powers and impliedly grant others in conflict therewith. * * * *Where the exercise of particular governmental powers may be fairly included in and authorized by general powers conferred upon municipalities, the rule expressio unius est exclusio alterius is not generally applied* to specific powers conferred to exclude powers that serve the purposes for which municipalities are organized, where such powers are not inconsistent with other powers conferred or with limitations imposed by the charter or by statute upon the municipal powers."

In Crawfordsville v. Braden, supra, the court said:

"When powers are thus enumerated in a statute which would belong to the corporation without specific enumeration, the specific statute is to be regarded, not as the source of the power, but as merely declaratory of a pre-existing power, or, rather, of a power which is inherent in the very nature of a municipal corporation, and which is essential to enable it to accomplish the end for which it is created. And the enumeration of powers, including a portion of those usually implied, does not necessarily operate as a limitation of corporate powers, excluding those not enumerated. Clark v. City of South Bend, 85 Ind. 276 [44 Am. Rep. 13]; First Nat'l Bank v. [Sarlls] Sarlss, 129 Ind. 201 [28 N. E. 434, 13 L. R. A. 481, 28 Am. St. Rep. 185].

"The corporation, notwithstanding such enumeration, still possesses all of the usually implied powers, unless the intent to exclude them is apparent, either from express declaration or by reason of inconsistency between the specific powers conferred and those which would otherwise be implied. The Legislature can unquestionably take from municipal corporations powers which would inferentially be conferred upon them by their creation, or it can restrict the exercise of such powers, or in any manner control their exercise, the legislative will being as to such matters supreme.

"Among the implied powers possessed by municipal corporations is the power to enact and enforce reasonable by-laws and ordinances for the protection of health, life and property."

Consequently the section above quoted is not modified or abridged by the more specific delegations of power conferred on cities by the Indiana statutes, among which a few are quoted herewith:

"The common council of every city shall have power to enact ordinances for the following purposes: * * *

"Third. To protect all city property. * * *

"Seventh. To declare what shall constitute a nuisance, to prevent the same, require its abatement, authorize the removal of the same by the proper officers, and provide for the punishment of the person or persons causing or suffering the same, and to assess the expenses of its removal against such person or persons, and to provide for collecting such expenses either by causing them to be placed on the tax duplicate or by suit. * * *

"Tenth. To regulate the location and management of starch factories, glue factories, renderies, tallow chandleries, bone factories, soap factories, tanneries, foundries, slaughter-houses, breweries, distilleries, livery stables, and all other establishments of which the business or trade may become noxious or injurious to public comfort or health; and to prohibit the erection of such buildings or the continuance therein of such noxious or injurious occupations whenever the public comfort or health may require it. For the purpose of this clause, such city is given jurisdiction for four miles from the corporate limits thereof. * * *

"Fifteenth. To regulate or prevent the storage of gunpowder, tar, pitch, resin, coal

oil, benzine, turpentine, hemp, hay, straw, cotton, nitroglycerin, dynamite, giant powder, petroleum, gasoline, gas or any product thereof, or any other explosive or combustible material or other material which may be deemed dangerous. * * *

"Thirty-first. To regulate the use of sidewalks and prohibit the use of vehicles thereon, and regulate all structures in, under or over the same. * * *"

It is with these statutes as a necessary background that the ordinance in question must be examined, analyzed and tested.

Two other rules governing the exercise of police power might well be stated:

(a) The municipality has the choice of means suitable to the ends sought and is not confined to the selection of any one of them. Smith v. City of Madison, 7 Ind. 86.

(b) The municipality is not subject to judicial control except in cases where the power or discretion is grossly abused to the oppression of the citizen. Valparaiso v. Gardner, 97 Ind. 1, 49 Am. Rep. 416; Crawfordsville v. Braden, supra; 15 Am. & Eng. Enc. of Law, 1046; Cusack Co. v. Chicago, 242 U. S. 526, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594.

Examining the ordinance, what do we find?

Obviously it involves the attempted exercise of police power. Its justification must be found largely in the inherent power of a city. As in all such cases involving a conflict between the citizen on the one hand and the public on the other, it is not easy to evenly hold the scales nor to accurately record the results. What to the individual is an unreasonable and unwarranted invasion of his property rights is to the adversary an act for the public welfare. Unfortunately each side is prone to overestimate his or its "rights" and to understate the strength of the other's position. And the perspective of each party is so different as to produce somewhat different pictures.

Whether the ordinance is a valid exercise of the police powers of a city, calls for a consideration of several specific questions. (a) May a city, under its police powers, regulate the location of oil filling stations. (b) Is there a legitimate basis for distinction between drive-in filling stations and oil stations located on the streets? (c) Are drive-in stations located within 200 feet of a public school or church subject to ordinance regulation, on that ground alone? (d) May the municipality make its permit depend on the affirmative action of the adjoining lotowners in that vicinity?

(a) Has appellant the implied authority to legislate respecting the location of all oil filling stations?

This query involves a consideration of the business of an oil and gasoline filling station and its effect upon persons living in the vicinity. In People ex rel. Busching v. Ericsson, 263 Ill. 368, 105 N. E. 315, L. R. A. 1915D, 607, Ann. Cas. 1915C, 183, speaking of an ordinance quite similar to the one under consideration, the court said:

"It is a matter of common knowledge that the automobile propelled by the use of gasoline is a large and sometimes noisy machine, which frequently, when in operation, emits an offensive odor. Automobiles go in and out of public garages at all hours of the day and night, producing noises which must necessarily interfere with the comfort and welfare of those in the immediate vicinity. In the starting of these machines and in the testing and repair of their engines a considerable noise is unavoidable. Gasoline and oil are used in places of this kind, and it is necessary to keep a considerable quantity of gasoline constantly on hand, which is transferred to the tanks of automobiles propelled by this means. In making this transfer a portion of it necessarily becomes vapor, thus creating a menace both because of the odor of the fumes and their inflammable character."

There is much similarity between a garage and a service station so far as the welfare of the public is concerned. Both are open in the evening as well as in the daytime, on Sundays, on weekdays, and on holidays. This the city council knew. They also knew that cars often line up at filling stations waiting to be served and their engines are frequently left running.

Moreover, it is the right of every citizen to walk in peace and safety on *either* side of a public street, and it is obvious that a filling station on a street with cars and trucks passing constantly and continuously in and out adds to the perils of the pedestrian. If a city council sees fit to act to control the location of these places of added danger, it can hardly be called an arbitrary, capricious, or unreasonable act. State ex rel. National Oil Works of Louisiana v. McShane, 159 La. 723, 106 So. 252; State v. Fleming, 129 Wash. 646, 225 P. 647, 34 A. L. R. 500; Sander v. City of Blytheville, 164 Ark. 434, 262 S. W. 23; State v. City of New Orleans, 159 La. 1016, 106 So. 549.

It is not necessary for an ordinance to show upon its face the reasons for its passage nor the purpose which it is hoped it will accomplish. The judgment of the council

may be rejected by the court only if it is *clearly* unreasonable and erroneous. And in this case, as in all other cases involving the validity of such legislation, all reasonable doubts must be resolved in favor of the validity of the legislation. People v. Gordon, 274 Ill. 462, 113 N. E. 864; People v. Metz, 193 N. Y. 148, 85 N. E. 1070, 24 L. R. A. (N. S.) 201.

I think the first query must be answered in the affirmative.

(b) Was there a legitimate basis for the classification of filling stations into those called drive-in stations and those which supply the customer from the street? Appellee stresses the fact that not all drive-in filling stations are prohibited by this ordinance but only gasoline filling stations employing pumps. They add, however, that the use of pumps in filling stations is practically universal. Conceivably, of course, a filling station might be constructed with an overhead tank from which gasoline was placed in the tanks of automobiles by gravity or with a reservoir from which the gasoline could be taken by buckets. But, to quote from the opinion in Cincinnati, etc., R. Co. v. McCullom, 183 Ind. 556, 109 N. E. 206, Ann. Cas. 1917E, 1165:

"It is almost impossible to provide for every exceptional and imaginary case, and a Legislature ought not to be required to do so at the risk of having its legislation declared void, even though appropriate and proper as applied to the general subject upon which the law is intended to operate."

I have no doubt that the council intended no discrimination between drive-in stations, but intended the ordinance to cover all drive-in stations and that this will, in fact, be its practical effect.

Our inquiry then should be directed solely to the existence of a legitimate basis for the classification of filling stations into those called drive-in stations and those which supply the customer from the street.

The council of the city of Vincennes was not the first to make this classification. Such a distinction was upheld in Sander v. City of Blytheville, 164 Ark. 434, 262 S. W. 23.

Surely there is an obvious difference between a drive-in station where customers pass over the sidewalks and a curb pump which is attended by no crossing of sidewalks. It was for the city council to determine whether the danger to pedestrians in certain places frequented by persons of tender years or by old and infirm persons was not such as to require a control of the location of such stations and to prohibit entirely, if necessary, their erection in the proximity of schools, churches, and similar public places.

(c) Prohibiting the erection of drive-in stations that are near to schools and churches does not bear the earmarks of unreasonableness. At such places large groups congregate. The age of school children alone invites legislative enactments for their special protection. The same may be said of the groups that attend church. Included are elderly people whose welfare, as fully as children, should receive consideration by the lawmaking bodies in enacting ordinances of this character. Nor is the distance, 200 feet from the school, church, or place of worship, unreasonable in my opinion.

(d) May a municipality make its permit for the erection of a drive-in oil station depend on the consent of a majority of the property owners located within a radius of 300 feet of the place where the filling station is to be erected? This presents a somewhat different question.

In passing, it might be observed that the provision of the ordinance respecting schools and churches might well be sustained, though the other provisions be declared invalid.

But making the issuance of the permit depend upon the favorable action of adjoining landowners does not invalidate such an ordinance as here under consideration. In Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. —, the court was dealing with an entirely different subject-matter. In the opinion in the last cited case, the court said:

"It is not suggested that the proposed new home for aged poor would be a nuisance. We find nothing in the record reasonably tending to show that its construction or maintenance is liable to work any *injury, inconvenience or annoyance to the community, the district or any person. The facts shown clearly distinguish the proposed building and use from such billboards or other uses which by reason of their nature are liable to be offensive.*"

The facts in the instant suit are more nearly like those disclosed in Cusack Co. v. City of Chicago, 242 U. S. 526, 37 S. Ct. 190, 61 L. Ed. 472, L. R. A. 1918A, 136, Ann. Cas. 1917C, 594. There the court sustained an ordinance which prohibited the erection of billboards without the consent of owners of a majority of the frontage on both sides of the street in the block where the billboard was to be erected. Surely the erection of a filling station would be as much an "inconvenience, injury, or annoyance" to those living near by as the putting up of a billboard.

This court in disposing of the instant suit

may not inquire into the motives that prompted the city officials. Nor are we interested in any alleged failure to enforce the law vigorously or impartially. The remedy, if any such official lapses occur, is political and not judicial. The ordinance in question does, upon its face, apply equally to all businesses similarly situated; and, in such cases, the due process and equal protection of the law are had. State v. McShane, 159 La. 723, 106 So. 252.

As was said by Justice Day in the case of Lieberman v. Van De Carr, 199 U. S. 552, 26 S. Ct. 144, 50 L. Ed. 305:

"It is primarily for the State to select the kinds of business which shall be the subjects of regulation, and if the business affected is one which may be properly the subject of such legislation, it is no valid objection that similar regulations are not imposed upon other businesses of a different kind."

I therefore favor a reversal of the decree.